**UNITED STATES of America**
**v.**
**William COLEMAN and Clyde Joyner.**
**Crim. No. 70-164.**

United States District Court,
E. D. Pennsylvania.

Feb. 8, 1971.

Louis C. Bechtle, U. S. Atty., Charles B. Burr, II, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Kenneth S. Harris, Philadelphia, Pa., for defendant William Coleman.

Joseph A. C. Girone, Philadelphia, Pa., for defendant Clyde Joyner.

## OPINION

JOSEPH S. LORD, III, District Judge.

Defendants seek to suppress (1) two revolvers, two ski masks and two shopping bags seized in two warrantless searches of an auto and (2) oral confessions given to, and memorialized in writing by, the F.B.I. A hearing was held in this matter on June 12, 1970.[1]

On February 6, 1970, at or about 6:45 p.m., patrolman Edwards of the Springfield Township Police observed the two defendants standing to the rear of a Chevrolet sedan. The officer was suspicious of these men because their car was parked in front of a large three-story house which was dark and appeared empty, because about a month earlier a bank in the area had been robbed (N.T. 14, 15),[2] and because they "ran" to the front seat of their car when the officer cruised by in his clearly marked patrol car (N.T. 20). Edwards immediately made a U-turn and pulled behind the defendants' parked vehicle (N.T. 15).

Officer Edwards approached the Chevrolet, and peered in at the defendants who were sitting in the front seat. The officer asked defendant Coleman, who was (literally, though not figuratively) in the driver's seat, for his owner's card and driver's license; Coleman produced them, and they "checked out all right" (N.T. 16). However, when Joyner was unable to produce identification (N.T. 16, 17), and when Coleman asserted that they were in the area to pick up a friend from work who he admitted

worked in Philadelphia (N.T. 16), the officer remained suspicious.

Edwards asked Coleman if he would mind opening the trunk, to which the latter replied, "No, not at all, I would be glad to" (N.T. 22). In Joyner's presence Coleman opened the trunk, and in it the officer saw " * * * quite a disarray * * * of clothing, bags, boxes" (N.T. 22, 23). Coleman picked up a toolbox from the disarray in order to show the officer his working tools, and this revealed a pistol which had been covered by the toolbox. Thereupon Edwards, without inquiring whether the pistol was registered (N.T. 23), arrested Coleman for transporting a firearm and Joyner for the possession of a firearm (N.T. 29). The pistol was seized at this point. Edwards ordered the defendants to sit in their car, and he proceeded to radio for aid. The defendants tried to flee in their car; however, after a chase of several blocks Edwards and an officer in another car boxed in the defendants and apprehended them (N.T. 24, 25). The defendants were then brought down to headquarters by Officer Edwards and both were charged with violation of the Uniform Firearms Act and with resisting arrest (N.T. 30).

At about 7:00 p.m. Detective Prath of the Springfield Township Police, responding to a call from headquarters, drove to the location where the defendants had been apprehended. Another officer briefed Detective Prath regarding the case (N.T. 44) and gave him the keys to defendants' car. Detective Prath then conducted a warrantless search of the car and seized a revolver, two ski masks and two shopping bags.

Shortly after being indicted the defendants were released on bail which they had posted in cash (N.T. 54). On February 9, 1970, Detective Prath told agent Deneen of the F.B.I. about the bail money that had been posted in cash

---

1. The inaction in this matter since that time was caused by defendants' failure to file their briefs until the middle of November, 1970.

2. All page numbers refer to the transcript of the June 12 hearing.

by the defendants and about the evidence obtained from the vehicle (N.T. 57, 68). Subsequently, the F.B.I. obtained arrest warrants on the basis of an affidavit which read as follows:

"Investigation conducted by Robert J. Deneen, Special Agent of the Federal Bureau of Investigation, which developed that on January 9, 1970 the aforesaid bank was robbed by two Negro males wearing ski masks, each carrying an automatic pistol and a shopping bag with a cord handle; that on February 6, 1970 the accused, Clyde Joyner and William I. Coleman, were arrested in Springfield Township and found in possession of two ski masks, two automatic pistols, two shopping bags with cord handles, one pair of black gloves; that the aforesaid articles were exhibited to four witnesses to the robbery on January 9, 1970, such articles being identified as identical to those in the possession of the robbers, and that on February 6, 1970, the accused * * * posted bond in Springfield Township * * * which bond was in cash and included nine one dollar bills stolen from the aforesaid bank on January 9, 1970." (N.T. 87, 88).

On February 12, 1970, at 8:15 a.m., two F.B.I. officers entered defendant Joyner's house and arrested him. They found him in his bedroom, apparently asleep, with a piece of fabric wrapped around his arm (N.T. 74, 76). Joyner said that he was a narcotics addict and that he had had a "fix" shortly before the officers arrived (N.T. 74, 75). Nonetheless, he appeared coherent (N.T. 75, 82). He was arrested and advised of his rights (N.T. 75, 76).

Joyner arrived at F.B.I. headquarters at about 9:15 a.m. (N.T. 76). He was stripped and searched (N.T. 76). No doctor saw him before his interrogation; however, he appeared coherent throughout the interview (N.T. 82). Before the interrogation began, Joyner was advised of his Miranda rights. He refused to sign a form waiving those rights, but stated that he understood those rights and was willing to talk to agents (N.T. 78). He proceeded to confess to participation in the bank robbery. The interview and processing of the prisoner concluded shortly after noon (N.T. 79).

Coleman was arrested by the F.B.I. at his place of employment, then was taken to F.B.I. headquarters. He was twice advised of his constitutional rights (N.T. 92). He confessed during a 25 minute interrogation.

## I. THE SEARCH BY OFFICER EDWARDS

The government contends that the search by Officer Edwards, though warrantless and not incident to an arrest, was consented to and is therefore constitutional. See, e.g., United States ex rel. Harris v. Hendricks, 423 F.2d 1096 (C.A. 3, 1970). The burden is on the government to prove that there was consent to the search, i. e., that there was a binding waiver of Fourth Amendment rights. E.g., Bumper v. North Carolina, 391 U.S. 543, 548, 549, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). And this burden of proof is heavy: it is only where there is "* * * an intentional relinquishment or abandonment of a known right or privilege," Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), that an effective waiver of a constitutional right can be found. More specifically, ·

"[a] search and seizure may be made without a search warrant if the individual freely and intelligently gives his unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied." Channel v. United States, 285 F.2d 217, 219–220 (C.A. 9, 1960).

Herein, Coleman gave "unequivocal and specific" consent to the search. We find that this consent was intelligent: Coleman was capable of understanding the consequence of such consent, viz., that the trunk of the car would be searched if consent were given. United States ex rel. Harris v. Hendricks, 423 F.2d 1096 (C.A. 3, 1970).

We further find that the consent was voluntarily given.[3] It follows that this consent, which is also binding upon defendant Joyner, see, e.g., Gurelski v. United States, 405 F.2d 253, 262 (C.A. 5, 1968) (consent by joint owner binding on other); Shorey v. Warden, Md. State Penitentiary, 401 F.2d 474, 478 (C.A. 4, 1968) (same), Anderson v. United States, 399 F.2d 753, 756 (C.A. 10, 1968) (same), validates the search which uncovered a revolver. Consequently, this revolver will not be suppressed.

## II. THE SEARCH BY DETECTIVE PRATH

■■ The government contends that this search qualifies as a valid search of an automobile.[4] E.g., Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L. Ed.2d 419 (1970); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). It is true that in terms of circumstances justifying a warrantless search there has long been a distinction drawn between an automobile and a home or office. E.g., Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). However, in all cases there must be probable cause for a search if it is to be constitutionally permissible.

"In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution. As a general rule, it has also required the judgment of a magistrate on the probable cause issue and the issuance of a warrant before a search is made. Only in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search. Carroll, supra, holds a search warrant unnecessary where there is probable cause to search an automobile stopped on the highway; * * *" Chambers v. Maroney, 390 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970).

■ In light of the decision in Chambers it seems clear that, if Detective Prath had reasonable cause to believe that the contents of defendants' automobile offended the law, the search he conducted would have been permissible. Before searching the vehicle Detective Prath was briefed generally as to what had taken place regarding the earlier search of the car and the flight of the defendants (N.T. 46, 47). He was informed that Officer Edwards had found a gun in the auto (N.T. 43), and he "assumed" that the defendants had been arrested on a gun charge. Further, he was aware—and this factor seems to have been uppermost in his mind—that the defendants' car had originally been parked near a bank which had been held up two months earlier (N.T. 47, 49). Knowing all this, we have no idea what Detective Prath reasonably expected to find inside the car other than its interior. This search was unconstitutional, and the revolver, ski masks and bags seized by Detective Prath will be suppressed. Having so decided, we need not treat defendants' contention that these items were the fruits of an illegal arrest.

---

3. "We note that the waiver here involved was not the product of an excessive display of police force or authority. See United States v. Marrese, 336 F.2d 501 (3 Cir. 1964); Villano v. United States, 310 F.2d 680 (10 Cir. 1962). [He] did not merely acquiesce to police demands. See Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Nor does he contend that his assent was given only after repeated refusals. See Pekar v. United States, 315 F.2d 319 (5 Cir. 1963)." United States

ex rel. Harris v. Hendricks, 423 F.3d 1096, 1100. 1101 (C.A.3. 1970).

4. This search, carried out when defendants were already under arrest and in custody, cannot be justified on the ground that it was incident to the arrest of defendants. Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968).

## III. THE CONFESSIONS

Defendants move to suppress their confessions on the grounds that (1) they were elicited in a manner which violated their privilege against self-incrimination and right to counsel, and (2) they are the fruits of unlawful behavior of the state police.

As to defendant Coleman, the record reflects only that he was given his *Miranda* warnings twice, that he asked to call his wife and was permitted to do so, and that he confessed thirty-five minutes after the interrogation began. In Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966), the Court stated:

> "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. A statement we made in Carnley v. Cochran, 369 U.S. 506, 516, [82 S.Ct. 884, 890, 8 L.Ed.2d 70] (1962), is applicable here: 'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything else is not waiver. * * *' "

There is no evidence in the record from which we can fairly conclude that Coleman validly waived his rights, and his confession must therefore be suppressed.

Defendant Joyner was shown the written waiver form used by the F.B.I. He refused to sign the form, but stated that he understood his rights and was willing to talk to the F.B.I. agents (N.T. 78). This interrogation, which culminated in an unsigned confession, lasted about two and three-quarter hours, during which period of time Joyner asked to call a lawyer and was permitted to do so. We have no doubt that Joyner, when he stated that he understood his rights and was willing to talk to the F.B.I. agents, acted in a sufficiently affirmative fashion to waive his rights. Hodge v. United States, 392 F. 2d 552 (C.A. 5, 1968). And we decide that the fact that Joyner asked and was allowed to call a lawyer did not operate as a retraction of this waiver.

Nonetheless, it is Joyner's contention that the record reflects both that his confession was involuntary and that it was the fruit of unlawful police activity. We cannot agree. Joyner's self-induced "fix" did not impair his mind or will. *See* People v. Schompert, 19 N.Y.2d 300, 304, 279 N.Y.S.2d 515, 226 N.E.2d 305 (1967), cert. denied Schompert v. New York, 389 U.S. 874, 88 S.Ct. 164, 19 L.Ed.2d 157. The arrests[5] of February 6, assuming *arguendo* that both were illegal, did not coerce Joyner, who had been out on bail for six days, to confess. *Cf.* Wong Sun v. United States, 371 U.S. 471, 491, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *compare* Westover v. United States, 384 U.S. 436, 494–497, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). And though the only fair inference from the record is that the F. B.I. agents told Joyner of the evidence they had against him, and though some of this evidence was unlawfully obtained,[6] we conclude that this confron-

---

5. The first arrest took place at the time the gun was seized; the second took place after the flight of the defendants from the first arrest.

6. The defendant contends that the bail money was the fruit of an unlawful arrest. However, it is our judgment that Joyner exercised an independent act of free will in deciding which money, if any, he would post as bail, that the police could not have reasonably foreseen that he would post bail in cash, and that the bail money was therefore not " * * * the target of police activity," Comment, Excluding From Evidence Fingerprints Taken After An Unlawful Arrest, 69 Yale L.J. 432, 436 n.

tation with unlawfully obtained evidence did not coerce the confession.

■ Though Joyner's confession was voluntary it nonethless may have been sufficiently tainted by police lawlessness to be excludible. Collins v. Beto, 348 F.2d 823, 828, 829 (C.A. 5, 1965) (Tuttle, J.). It is well settled that the Federal Government may not use a confession which is the fruit of unlawful activity of state authorities. Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). Nor is there doubt that it is the government which has the burden of proving that the unlawfully obtained evidence did not induce the confession under attack. Harrison v. United States, 392 U.S. 219, 224, 225, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

■ The government can satisfy its burden if it proves that the connection between the lawless police activity and the confessions "had become so attenuated as to dissipate the taint," Wong Sun v. United States, 371 U.S. 471, 491, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963), or that the confessions were not obtained by exploitation of the original illegality but by means "purged of the primary taint." Id. at 488, 83 S.Ct. 407, 9 L.Ed. 2d 441. However, to speak blithely in such generalities is to mask an underlying confusion: in deciding whether or not a confession is tainted the Court in Wong Sun emphasized considerations of illegality, casuality and voluntariness, and in fact no clear cut rule emerges from these ingredients. 3 Wigmore, Evidence § 862b (Chadbourn Rev. 1970). With this confusion of criteria as a backdrop we consider Joyner's contention that his confession was the fruit of unlawful arrests,[7] and an unlawful search and seizure by Detective Prath.

■ We recognize that there was a causal link between the unlawful activity of the local police and the confession; that the F.B.I. exploited the illegality by informing Joyner of the unlawfully obtained evidence they had; and that the fact that the F.B.I. had this evidence put Joyner at a psychological disadvantage.

Nonetheless, since there is no indication that the unlawfully seized evidence was aggressively used during the interrogation, since six days passed between the arrests and seizure and the confession, since only a portion of the government's case consisted of unlawfully seized evidence, or the fruits thereof, and since the fact that Joyner thought he would be harmed by the evidence in question is in any case not in itself sufficient to taint the confession, see United States v. Bayer, 331 U.S. 532, 540, 541, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), we decide that the connection between the unlawful activity and Joyner's confession is "so attenuated as to dissipate the taint."

### ORDER

And now, this 8th day of February 1970, it is ordered

1. that the gun lawfully seized by Officer Edwards shall not be suppressed;

2. that the other revolver, the two ski masks, and the two bags, i. e., the items seized by Detective Prath, shall be suppressed:

3. that defendant Coleman's confession shall be suppressed;

4. that defendant Joyner's confession shall not be suppressed.

---

12 (1960), and not the fruit of the assertedly unlawful police conduct. Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); Note, Fruit of the Poisonous Tree—A Plea for

Relevant Criteria, 115 Pa.L.Rev. 1136 (1967).

7. We continue to assume, for the purposes of argument, that both arrests were illegal.